Michael WRIGHT, Appellant,

v.

Fielding HAAS, Appellee.

No. 49914.

Supreme Court of Oklahoma.

July 18, 1978.

Rehearing Denied Dec. 4, 1978.

Peter Clinton Moore, Norman, for appellant.

Robert L. Bailey, Sam F. Whitlock, Norman, for appellee.

LAVENDER, Vice Chief Justice:

Michael Wright (Wright), a Norman, Oklahoma, resident, brought a libel suit against Fielding Haas (Haas), a former Norman city attorney. The alleged defamatory statements were contained in a letter [1] written by Haas that was addressed to

1. Text of Haas letter follows:

"To the editor:

A letter appeared in the issue of September 16, 1975, from Mike Wright, claiming to be a member of the Norman Citizens for Civic Responsibility (NCCR). Since he apparently desires to continue the attack on behalf of himself, his cohorts in the NCCR and the other radicals who run that organization, perhaps you will accomodate my reply thereto.

First, let me state that my advice to the city council was based upon what I, and others, consider to be sound legal grounds. The releasing of the tapes to the council, thence to the media, thence to the public, would have been a serious breach of the city charter. I have never permitted vilification from radical or revolutionary quarters to deter me in the practice of my profession. If I did, I would voluntarily relinquish my license to practice law. I would also like to add, in this regard, that I do not relish answering people such as Wright, but the public should be aware for whom he speaks.

Wright, it is true, is one of the organizers and principle leaders of the so-called NCCR. He, along with people named * * * and others created the organization using the issue of the increase in utility rates in July, 1974. Of course, no organization was needed to create that issue; it was, as subsequently proven, a universal issue. Wright admits in his letter that has 'radical' views. He, at least in 1969 and 1970, had more than radical views; he effectuated those views by participating in activities on the campus which, but for the protection of highway patrol troopers and the national guard, would have resulted in the fire-bombing of at least one book store and the armory. As background on Wright and some of his comrades in the NCCR, your readers and the public should consider the following:

During the late 1960's a rag was published entitled 'The Jones Family Grandchildren.' Principally, it was the mouthpiece of the Students for Democratic Society, but its membership also included members of something called the 'OU Committee to End the War.' Wright was a member of both organizations. The sheet published by these radicals openly advocated the destruction of the government; advised and counseled its readers on how to beat the draft; how to beat the 'Pigs' on interrogations should they be arrested. Its membership included notorious drug pushers and users and radical activists who advocated the burning of university buildings; who flew the Viet Cong flag; interferred with ROTC ceremonies and generally created havoc on an innocent facility of the State of Oklahoma. * * * now a member of the city council, has his name among the membership of this sheet. Obviously, their colors haven't changed, for they are still in association with one another. Some of your readers might recall that people were arrested for selling the so-called newspaper.

As another example of Wright's 'views,' I note that he also held meetings, or 'workshops' on such things as 'Imperialism' and the university 'ROTC.' And in May, 1970, along with some 10 other radicals, voted to commence violence and confrontations with the police and national guard. The question one might ask, is, why create violence? Personally, I look to the columns of the Jones Family Grandchildren for my answer: the overthrow of the government by any means. The sad part of that avocation is that they had nothing in mind to replace the old institutions of government. They merely wanted to destroy the 'establishment' for destruction's sake. In this I am reminded of the past four months, having personally observed their tactics; dissension and distrust in the police department of Norman, in the city administration, even as to the council. And for what reason?

* * * was the chairman of the OU Committee to End the War. He was high in the planning of the radical march on Washington during that time. He advocated interferring with judicial procedures on campus, ROTC ceremonies and other lawful functions of that state institution. He seemed to be proud of the fact that he was a member of the Jones Family Grandchildren. It could logically follow that he, too, advocated what the other radicals advocated: destroying the 'establishment.' As an example of * * * activities, the JFG held a dance on the South Base in December, 1969. Neal called this dance to the attention of a meeting of the Committee to End the War and then encouraged everyone to talk to the GI's who would be present. We might wonder just what the soldiers from Fort Sill were to be told or encouraged to do.

Another 'leader' of the NCCR is * * *. * * * had been a resident of Norman for only five or six weeks prior to the increase in rates last July 30, 1974. * * * was a Hall flunkie; appointed to a minor political job in the Capitol. He is a paid political organizer; he has done political work in Texas, Oklahoma, Virginia and Rochester, NY. We wonder just what attracted him to Norman. Perhaps, the NCCR's ultimate goal of forcing the city to purchase the various public utilities in Norman has something to do with it.

the editor of, and published, in *The Oklahoma Daily,* the University of Oklahoma newspaper. The Haas letter was in response to a letter [2] written by Wright similarly addressed and published in the same newspaper a few days before the Haas response. These letters were preceded by a background of controversy involving a local issue concerning utility rates of the municipally owned utility and swirling around the city council, an organization called Norman Citizens for Civic Responsibility (NCCR),

the city attorney, his voluntary resignation, and subsequent rehiring.

Here, in seeking to determine the characterization of Wright, the defamed party, as either a public or private personality, we follow the understanding of *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) as expressed by this court in *Martin v. Griffin Television, Inc.,* Okl., 549 P.2d 85 (1976). *Gertz, supra,* allowed the designation of the defamed party as a "public figure" to rest on either of two alternative

* * * is another leader of the NCCR. * * can tell us about radical activities involving Tinker Field. He is one of the 'Tinker 12.'

And * * * former wife, * * *, who as the spokesman for the NCCR, demanded a grand jury to investigate city administration. Then when the city administration requested the council to try to get a grand jury called, * * * and the members of the leadership of NCCR were the first to run for cover. They didn't want a grant jury, no more than they want it public knowledge that the transcripts of the police investigation conducted by the city manager were turned over to both the Cleveland County District Attorney's office and the United States District Attorney's office for the purpose of determining if a crime had been committed by anyone.

As long as your readers know who the Wrights and * * * are, I don't mind what they have to say about me. I did not spend my time advocating the burning of the flag, or state buildings, or destroying my government. I served it. And with honor." Fielding D. Haas, Former City Attorney."

2. Text of Wright letter follows:

"To the editor:

For the past year the Norman Citizens for Civic Responsibility (NCCR) has encouraged the people of Norman to exercise their democratic rights. Predictably, in recent weeks local anti-progressive forces have made a concerted effort to create a backlash against NCCR, in order to erode its effectiveness.

The Oklahoma Daily has been a willing instrument in the anti-NCCR campaign. Two weeks ago the paper ran an editorial which stated that the NCCR was 'running the city.' Shortly thereafter, the Daily gave heavy coverage to municipal counsel Fielding Haas' hysterical claims that NCCR was controlled by 'radicals' and the building-burning 'antiwar types.' Following Haas' resignation, the Daily 'congratulated' itself for having brought out a councilman's denial that NCCR was 'pulling his strings.'

In all likelihood, the ridiculous statement that NCCR was running the city was planted at the

Daily by an anti-NCCR source, as part of a calculated effort to create a backlash.

For the record, the NCCR is not a shadow government, but it has been an effective citizens' lobby. There are individuals in the group who have radical opinions on a number of contemporary social issues: I include myself in this category. There are also moderates, liberals and conservatives. NCCR people are united on certain local issues, such as support for reasonable utility rates and ward representation. We respect one another's differences in viewpoint, and no single bloc controls the group.

The recent attempts to intimidate NCCR members and supporters with the 'radical' label reminds one of the man who made a political career out of redbaiting: Richard Nixon. Nixon's famous "Pink Lady" smear campaign against Helen Douglas set a trend which dominated his style for years. Two decades later, he was finally revealed as a crook. There are lessons in this.

Nixon's game finally ended when the tapes which he fought so hard to conceal were finally heard. Recently, Norman residents have seen a similar effort to suppress tape-recorded evidence by a man who has also indulged in red scare tactics. The parallels do not escape notice.

Unfortunately, the city council saw fit to rehire Fielding Haas after he made his attack on NCCR. One would like to believe that they were merely being magnanimous. Another ugly hypothesis raises its head; could it be that the council sought to satisfy Haas in order to prove that they are not 'radical'? If this is so, what kind of precedent is set? Will anyone be able to bludgeon the council into taking unwise actions by merely yelling 'radical'?

After the Council's appeasing treatment of Haas, his aggression continued. Last week he insulted them after his rehiring by publicly stating that the city was run by 'dingalings.' How long must this continue? Hopefully, the council members will soon restore their tarnished esteem, by quickly severing all ties between Fielding Haas and the City of Norman. Mike Wright."

bases. First, one may become a public figure for all purposes and in all contexts. This may be achieved through pervasive fame or notoriety. Second, and more commonly, an individual becomes a public figure for a limited range of issues. This is achieved by an individual voluntarily injecting himself into a particular public controversy. Both Gertz and Martin were determined to be private individuals. Neither had voluntarily injected himself into a particular public controversy; neither had thrust himself into the vortex of a public issue, nor had either attempted to engage the public's attention to influence the outcome of a public issue.

We find present case to be a corollary to *Martin, supra.* Wright voluntarily injected himself into the vortex of the public controversy by writing his letter addressed to the editor with the intent it be published. Wright's letter sought to engage the public's attention to influence public issues. He defended the NCCR. He made an issue of its composition. He makes himself an issue through his own labeling of himself as "an individual having radical opinions on a number of contemporary social issues." Other issues easily identifiable in the Wright letter include, but are not limited to, Haas for his opposition to the NCCR, and his rehiring by the city council.

Though the lack of rebuttal opportunities may be considered in seeking to distinguish between public and private defamation plaintiffs, there are more important distinctions. *Gertz, supra.* Here, both Wright and Haas had established a likelihood of rebuttal through their letter writing to the editor and the publishing of both their letters. Wright is a public defamation plaintiff for the limited range of issues encompassed within his letter. *Martin, supra; Gertz, supra.*

With Wright determined to be a public defamation plaintiff, the *New York Times* standard must be applied. *Martin, supra,* p. 87; *Weaver v. Pryor Jeffersonian,* Okl., 569 P.2d 967, 973 (1977). That standard requires actual malice to be an essential element of libel as applied to a public figure. Actual malice is defined as "with knowledge that it was false or with reckless disregard of whether it was false or not."

In granting summary judgment to Haas, the trial court applied a "qualified privilege." It has been suggested that common law imposes strict liability for the publishing of a false and defamatory statement about another, but also allows a "conditional privilege" to protect certain defined interest if that privilege was not abused.[3] Libel and slander case law in this jurisdiction appears to recognize two bases for a "qualified privilege." One base stems from statutory law.[4] *German-American Ins. Co.*

**3.** Restatement of the Law, Second, Torts 2d, Special Note on Conditional Privileges and the Constitutional Requirement of Fault, at p. 259, reads in part:

"At common law strict liability was imposed for the publishing of a false and defamatory statement about another. The publisher was held liable even though he had used all due care to check the accuracy of his statement and thus reasonably believed it to be true. This has now been changed as a result of Supreme Court interpretation of the First Amendment to the Constitution. * *

"At common law, a defendant was privileged to make a statement about another party even though it was defamatory, so long as he was making the statement to protect certain defined interests and he did not abuse the privilege. These are called conditional privileges, * * *."

**4.** Modern statutory sections of 12 O.S.1971, § 1443 and § 1445 establish a statutory presumption of malice on the part of one publishing a defamatory or injurious statement. 12 O.S.1971, § 1443 provides:

"A privileged publication or communication is one made:

First. In any legislative or judicial proceeding or any other proceeding authorized by law;

Second. In the proper discharge of any official duty;

Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer,

*v. Huntley,* 62 Okl. 39, 161 P. 815 (1916); *Bland v. Lawyer-Cuff Co.,* 72 Okl. 128, 178 P. 885 (1918); *Reininger v. Prickett,* 192 Okl. 486, 137 P.2d 595 (1943). The other base accepts a "conditional privilege" without reference to statute. *Beshiers v. Allen,* 46 Okl. 331, 148 P. 141 (1915); *Johnson v. Inglis,* 190 Okl. 316, 123 P.2d 272 (1942). See also *Fawcett Publications, Inc. v. Morris,* Okl., 377 P.2d 42, 52 (1962).

With the holding in *Martin, supra,* of presumed malice under Oklahoma libel and slander statutes[5] being unconstitutional, there can be no presumption for rebuttal to act upon as a statutorily carved out "conditional privilege."

■ As already indicated, a "conditional privilege" created at common law is lost through abuse. One such identified abuse is knowing the defamatory matter to be false, or acting in reckless disregard as to its truth or falsity.[6] That is the same standard as imposed upon Wright as a "public figure." With the required proof of actual malice, then the abuse, and resulting loss, of any common law "conditional privilege" is also proven.

■■ We hold there is no longer a "conditional privilege" available, either by statute or common law, as a defense to a public defamation plaintiff.

The Haas letter must be viewed as measured by the *Times* standard. The trial court granted summary judgment and found no evidence that Haas in fact entertained serious doubts as to the truth contained in the Haas letter, or that the letter was written by Haas with reckless disregard for the truth or falseness of the statements therein contained.

*Weaver, supra,* p. 973, discusses the application of Rule 13[7] authorizing summary judgment to libel cases requiring actual malice, saying:

"* * * on motion for summary judgment all inferences and conclusions to be drawn from underlying facts contained in such materials as affidavits, admissions, depositions, pleadings, exhibits

---

falsely imputes crime to the officer so criticised.

In all cases of publication of matter not privileged under this section, *malice shall be presumed from the publication, unless the fact and the testimony rebut the same.* No publication which, under this section, would be privileged, shall be punishable as libel." (Emphasis added.)

12 O.S.1971, § 1445 provides:

"An injurious publication is *presumed to have been malicious* if no justifiable motive for making it is shown." (Emphasis added.)

Like presumptions were held to be unconstitutional by the United States Supreme Court in *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Martin v. Griffin Television, Inc.,* Okl., 549 P.2d 85 (1976) this court following the dictates of the United States Supreme Court in *Gertz, supra,* held that the legislative created presumption of malice under the Oklahoma libel and slander statutes to be unconstitutional. In doing so, we found portions of 12 O.S.1971, § 1443 and § 1445, supra, to be unconstitutional. Additionally, we found portions of 12 O.S.1971, § 1444 to be unconstitutional. Section 1444 of Title 12 dealt with pleadings and proof and defenses in libel and slander actions. The portion of the statute held unconstitutional by this court dealt with the plaintiff's burden of proof; that portion read: "* * * and the plaintiff to recover shall *only* be held to prove that the matter was

published or spoken by the defendant concerning the plaintiff."

**5.** Portions of 12 O.S.1971, §§ 1443, 1444, and all of § 1445, *Martin, supra,* p. 90.

**6.** Restatement of the Law, Second, Torts 2d, Subtitle III. Abuse of Privilege, § 600 reads in part:

"b. One consequence of the holding (*Gertz, supra*) is that mere negligence as to falsity, being required for all actions of defamation, is no longer treated as sufficient to amount to abuse of a conditional privilege. *Instead, knowledge or reckless disregard as to falsity is necessary for this purpose.* The policy upon which the conditional privilege is based then no longer applies, and * * * the publisher is not given the protection that the privilege will otherwise afford, if the matter turns out to be false. * * *.

"Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement. The standard here is the same whether liability will be imposed for a defamatory communication about a public official or a public figure * * *." (Explanation and emphasis added.)

**7.** Rules–District Courts, 12 Okl.St.Ann.Ch. 2–App., Rule 13.

and the like, must be viewed in a light most favorable to party opposing the motion. *Northrip v. Montgomery Ward & Co.,* Okl., 529 P.2d 489 (1974).

"While ordinarily the burden of proving actual malice is upon the official who complains of defamation, it was held in *Tagawa v. Maui Publishing Co.,* 49 Haw. 675, 427 P.2d 79 (1967), that on a motion by defendant for summary judgment in a libel action, the defendant has the burden of showing there is no issue of actual malice in the case.

"Motion for summary judgment should be denied if the facts concerning any issue raised by the pleadings and affidavits thereinafter filed in the case are conflicting, or if reasonable men, in exercise of fair and impartial judgment, might reach different conclusions from undisputed facts concerning any issue as set forth in such instruments. *Northrip v. Montgomery Ward & Co., supra.*"

The Haas deposition given in present case indicates the sources, kinds of knowledge he acquired about Wright and his interpretation of that knowledge. Included were conversations with various security officials and much reliance on contents of an "intelligence log" with references to Wright. These, along with other information in affidavits, were the principal bases for many of the statements made in Haas's letter. Viewing that evidence in the light most favorable to Wright, the party opposing the motion for summary judgment, we find reasonable men might reach a different conclusion as to whether Haas wrote his letter with actual malice, as heretofore defined in this opinion. We cannot find that there is no substantial controversy as to any material facts so as to sustain the summary judgment.

The trial court is reversed in granting summary judgment to Haas and cause is remanded. The trial court was correct in, and this cause requires, the application of the "Times standard," for Wright is a public defamation plaintiff.

Reversed and remanded.