Kenneth E. MILLER, Plaintiff,

v.

LEAR SIEGLER, INC., a corporation, Defendant.

Civ. A. No. 76–255–C6.

United States District Court, D. Kansas.

July 24, 1981.

Alexander B. Mitchell of Sargent, Klenda & Glickman, Wichita, Kan., for plaintiff.

Robert C. Foulston of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for defendant.

## DECISION OF THE COURT

THEIS, District Judge.

This is a libel action brought by the plaintiff, Kenneth E. Miller, against his former employer, Lear Siegler, Inc. Plaintiff contends that certain statements made by defendant in reports to shareholders, and in press releases to financial publications, were libelous of plaintiff; that such libel damaged plaintiff; that defendant published the statements with knowledge of their falsity or with reckless disregard for the truth; and that plaintiff is further entitled to punitive damages.

Defendant admits publishing the press releases in question, but denies that they are libelous. Defendant contends that the releases were true. Defendant also contends that it was acting under either an absolute or qualified privilege based upon the reporting requirements of the securities laws and defendant's duty to its shareholders. Defendant contends that its actions in regard to plaintiff were without malice; that any damages plaintiff may have suffered were not of the nature or extent alleged; that plaintiff failed to mitigate his alleged damages; and that plaintiff is not entitled to claim or recover punitive damages.

Trial of this action was to the Court. The Court's decision consists of findings of fact from the evidence, principles of law applicable to decision in this case, and an opinion discussing conclusions of law applicable from the findings of fact.

### FINDINGS OF FACT

*Events Leading to Meeting of October 29, 1975*

1. Plaintiff was an employee of defendant from 1953 through August 20, 1975. From 1968 until 1975, plaintiff was President and General Manager of the defendant's Management Services Division (MSD) in Oklahoma City, Oklahoma.

2. Defendant is a large diversified corporation. As of June 30, 1979, it had forty-nine divisions and subdivisions operating in

twenty-three states and eight foreign countries. For the year ending June 30, 1979, it had net sales of approximately 1.327 billion dollars and had approximately 125 million dollars in earnings before taxes.

3. The events which led to this lawsuit were precipitated by a letter of resignation dated July 21, 1975, from a MSD staff accountant, Lew Massuere, to Homer J. Roush, his immediate superior. In this letter (Pl.Ex. 1), Massuere wrote that he had overstated MSD unbilled receivables by about $500,000 as a result of a failure by Massuere to reverse an accrual entry. In the letter, Massuere stated that he was totally to blame, and stated that he had delayed divulging the irregularities because of the financial problems MSD had undergone during the last fiscal year.

4. Mr. Roush informed plaintiff of the letter and, after a brief investigation, plaintiff telephoned his superior, Larry Thompson, who was stationed at corporate headquarters in California. This triggered an investigation by defendant into the accounting situation at MSD.

5. The investigation was conducted by the MSD staff and by other corporate employees, including auditors from a recently formed internal auditing department. By letter of August 19, 1975, defendant notified its outside auditor, Alexander Grant & Co. (AG&Co.), of the MSD problems.

6. On August 20, 1975, Larry Thompson requested the plaintiff's resignation, and told plaintiff he would be placed on a month-to-month salary severance agreement until the extent of the MSD accounting problem was known. The decision to fire plaintiff was made at the highest corporate level, with the approval of defendant's President and Chairman of the Board, Robert Campion, who took an active part in the decision to replace plaintiff. Defendant's officers involved in the decision to fire plaintiff all testified that the firing was not due to the accounting problems in and of themselves, but due to a growing dissatisfaction with plaintiff's performance. The Court finds that by weight of the evidence, the accounting problems were the major, if not the only, cause for plaintiff's dismissal.

7. The investigation continued into the fall of 1975. For a brief period Massuere was rehired to help unravel the accounting problem he had admitted to creating. He soon left again, leaving a note saying he had created the "credibility gap." (Pl.Ex. 2.) The estimated amount of overstated earnings continued to grow as the investigation proceeded.

8. While the investigation was proceeding, defendant was finalizing a decision to change outside auditors. On September 15, 1975, Campion wrote to William Mette, Senior Partner of AG&Co., to inform him that defendant was replacing it with Price Waterhouse & Co. Defendant's officers all testified that the decision to change auditors was totally unrelated to the accounting problems at MSD. The Court finds, however, that the fortuitous discovery by defendant of large accounting irregularities which the outside auditor had failed to discover must have contributed to or reinforced the decision to change outside auditors, and was likewise an additional effort of the principal corporate officers to absolve themselves of culpability for the auditing problems of the defendant corporation.

9. On October 17, 1975, defendant issued its press release (Def.Ex. II) for the first quarter of 1976. The release reflected the fact that defendant and its new outside auditor, Price Waterhouse, approached the MSD problem by writing off the unsupportable receivables without discussing the nature of the problems necessitating the write-off.

10. On October 22, 1975, a meeting was held between defendant's representatives and representatives from A.G.&Co. Representing defendant were Campion, David Louks (Vice President and Controller for defendant corporation), and Barton Beek (Outside General Counsel and member of the Board of defendant corporation). Representing A.G. & Co. were William Mette, Ted Thompson and an outside attorney. A representative from Price Waterhouse was present for the latter part of the meeting.

11. At this meeting, A.G. & Co. took the position that the October 17, 1975, disclosure statement was inadequate because the overstatement of earnings at MSD was material, based both on the amount involved and the fact that deliberate false entries were involved. A.G. & Co. said that without additional disclosure it would be forced to withdraw certification of defendant's financial statement.

12. The defendant representatives contended that the overstatements were not material and that no restatement of earnings was required.

13. The disclosure argument was not resolved at the October 22nd meeting. At the request of A.G. & Co., another meeting was scheduled for October 29, 1975.

*The Meeting of October 29, 1975*

14. The October 29, 1975, meeting between representatives of defendant and A.G. & Co. was held in Chicago, with Campion, Louis and Beek representing defendant, and Mette and seven others representing A.G. & Co.

15. At this meeting the debate over whether disclosure was required was renewed with great vigor. A.G. & Co. continued to insist that unless defendant restated earnings for the fiscal years ending in 1973, 1974 and 1975, A.G. & Co. would withdraw its clean audit opinion for defendant for the years 1974 and 1975. Such a restatement of earnings would require additional disclosure statements.

16. While the defendant representatives continued to argue that the accounting problems were not material and that restatement was not required, they finally concluded that defendant had no choice but to restate earnings.

17. Withdrawal by A.G. & Co. of the clean audit letters would have meant that defendant would not be able to meet Securities and Exchange Commission (SEC) filing requirements, which in turn would have caused suspension of all trading of defendant's stock. This would have caused great economic hardship to the corporation and its shareholders.

18. Defendant had an honest and reasonable belief that it was required to restate its earnings and to also make attendant disclosure statements as required by the SEC and by the New York Stock Exchange (NYSE), and also as required by a duty to its stockholders.

19. Once defendant agreed to restate its earnings, Beek drafted a press release. This press release underwent several redraftings as the A.G. & Co. and defendant representatives discussed the content and form of the release. The final draft of the release was approved by both the defendant and A.G. & Co. representatives.

20. After the final draft of the release was approved, the defendant representatives flew to New York City to meet with New York Stock Exchange personnel and to place the press release on its wire services. A copy of the press release is attached hereto as Appendix "A". The contents of the press release were incorporated, in varying degrees, into stories in several major publications, including the Wall Street Journal and the Los Angeles Times.

*The Press Release*

21. The press release, on its face, would render in the mind of the average lay reader a conclusion, impression or opinion that the plaintiff was implicated in, connected with, or responsible for the accounting irregularities in the MSD, and that fraud may have been involved in such irregularities.

22. This conclusion is defamatory and tends to expose plaintiff to public contempt and obloquy, deprive him of public confidence, and injure him in his profession.

23. The defamatory implications are false.

24. Although plaintiff's name did not appear in the release, the language was such that persons reading it would, in the light of surrounding circumstances, be able to understand that it refers to the plaintiff, and it was so understood by at least one other person.

25. Although an innocent interpretation of the release might be possible, the release

cannot *reasonably* be interpreted in an innocent way. Rather, the defamatory implications are clear.

26. The press release noted that the company discovered accounting irregularities and that internal auditors had investigated the situation and were working to straighten out the records. The implication was that the company's internal auditors uncovered the problem. In reality, the problem came to light only upon the confession of an MSD accountant. The defendant's internal auditors had failed to discover the problem and, in fact, the defendant's internal auditing department was barely functioning.

The evidence showed that prior to 1974 the defendant had no internal auditing division. In 1974, Louks proposed that an internal audit division be created. One of the reasons for the proposals was previous accounting "surprises" in some of the defendant's divisions. In his proposal Louks pointed out the following objectives of internal auditing (Def.Ex. Y):

"Reviewing and appraising the soundness, adequacy and application of accounting, financial and operating controls.

Ascertaining the extent of compliance with established policies, plans and procedures.

Ascertaining the extent to which company assets are accounted for, and safeguarded from losses of all kinds.

Ascertaining the reliability of accounting and other data developed within the organization.

Appraising the qualities of performance in carrying out assigned responsibilities."

The internal auditing department was only beginning to function in 1975, with a small staff of only eight to ten employees. There was no evidence that any internal auditors ever visited or reviewed MSD until after the first Massuere confession letter. The Court finds that an actively functioning internal auditing division would have been in a better position than plaintiff to discover accounting irregularities. The Court also finds that, had there been an active internal auditing department there is a good chance the accounting problems would have been uncovered much sooner than they actually were.

27. In the release, the defendant noted that it had changed auditors, but emphasized that the decision to change auditors was totally unrelated to the accounting problems. No such disclaimer was added when the defendant noted that there was a new president at MSD, immediately after noting that the accounting problems were confined to that division. The clear implication, taken in light of the entire release, is that A.G. & Co. was not negligent in failing to discover the irregularities, but that plaintiff was connected with or implicated in the accounting problems. In reality, A.G. & Co. had audited MSD for the years ending June 30, 1974, and June 30, 1975, but failed to discover the accounting problems at MSD. It was the testimony of Hahn and Louks that A.G. & Co. should have discovered the problems. Louks said he was "amazed" at the failure of A.G. & Co. to discover the problems. The Court finds that A.G. & Co., the outside auditor hired by the corporate management of defendant, was in a much better position to discover accounting irregularities than was the plaintiff, who corporate management knew was untrained in accounting, and that A.G. & Co. probably should have discovered the problems at MSD.

28. At the time of the press release, absolutely no evidence existed that would connect plaintiff with the accounting problems. There was likewise no evidence of fraud in the sense of stealing or embezzlement. Since the release, no evidence of such fraud or evidence connecting plaintiff with the irregularities has been discovered.

29. The overall effect of the press release was to connect the plaintiff with the accounting problems, while making it appear that defendant's higher echelons of corporate management, and the outside auditors, were diligent and blame-free.

*Knowledge and Motivation of the Drafters of the Release*

30. At the time the release was drafted, defendant's representatives at the meeting

at which the press release was drafted, were aware of the findings of the defendant's investigation into the accounting problems at MSD. While the investigation did not produce a final report until March 17, 1976 (Def.Ex. LL), the following was known to defendant's representatives at the October 29, 1975 meeting:

(a) There was an overstatement of unbilled accounts receivable at MSD of approximately 1.5 million dollars. The overstatement was, for the most part, intentionally created with the use of fictitious bookkeeping entries and omissions.

(b) Lew Massuere, in his letter of July 21, 1975, which precipitated the investigation, stated that unbilled receivables were overstated by approximately $500,000, and that "I am to blame 100%."

(c) The defendant's investigation revealed that more than $500,000 was involved in the MSD problem. The investigators were forced to revise their estimates of the problem upward, with the estimate reaching 1.2 million dollars by August.

(d) In August, Massuere was rehired in an attempt to help unravel the MSD problem. On August 11, 1975, he left again, leaving behind a brief note, which read:

"I've created your credibility gap—I got myself trapped and couldn't work it out—sorry—but I can't take the existing pressure anymore." (Pl.Ex. 2.)

(e) The investigators had uncovered no evidence that any other person was working with Massuere in the creation of the fictitious accounts or that any other person was involved in covering up the irregularities.

(f) There was no evidence linking the plaintiff in any way with the irregularities. Plaintiff, upon learning of the first Masseure letter, promptly notified his corporate superiors of the problem.

31. In light of the above undisputed facts, the Court finds that the defendant's representatives at the meeting which produced the press release, had absolutely no evidence and absolutely no reason to believe that plaintiff was involved in the accounting problems at MSD. This was admitted by Hahn, Larry Thompson, Louks, Campion, and Beek.

32. In light of the above knowledge possessed by the representatives of the defendant at the time the press release was drafted, the Court finds that, in drafting and issuing the release, defendant's representatives acted with reckless disregard of the truth or falsity of the defamatory matter, and there was a high degree of awareness of the probable falsity or serious doubt as to the truth of the defamatory matter among those drafting the release.

33. The drafters of the release knew that the announcement that Miller had been replaced as president of MSD had already been published in the trade journals in September.

34. In finding that defendant acted with reckless disregard for the truth, the Court notes in particular the testimony of Barton Beek. In response to a question as to why the disclaimer was put in for A.G. & Co., Beek testified that without such an express disclaimer people might believe that the change in auditors was connected with the accounting problem at MSD. The Court has found that with the presence of such a disclaimer the clear implication is that plaintiff was implicated in or connected with the accounting irregularities. Beek's testimony demonstrates that defendant acted recklessly in regard to plaintiff, and had a high degree of awareness of the implications created by the language of the release.

35. It was in the interest of all parties at the October 29th meeting to focus blame for the accounting problems elsewhere than upon themselves. A.G. & Co. hoped to avoid the implication that it was at fault for failing to discover the problems at MSD in the course of its duties as outside auditor. The corporate executives did not want others to conclude that defendant corporation

had failed to discover the problem at MSD and that the internal auditing policies of defendant were such that a large problem could exist and come to light only by fortuity.

36. It is unclear whether A.G. & Co. and the high level officials of defendant singled out plaintiff to take the blame for the problem. It is clear that, in drafting the release, defendant acted in reckless disregard for the truth of the defamatory implications contained in the statement, while scrupulously insuring that the press release would not implicate A.G. & Co. or the high level officials of defendant in any fault or negligence. Again, the evidence is clear that A.G. & Co. acted with persuasive oppressiveness upon the defendant officials relative to both the necessity and content of the draft of the press release.

*Damages*

37. There is insufficient evidence to support a finding that the defamatory matter in the press release actually made it more difficult for plaintiff to find subsequent high level employment commensurate with his prior good reputation, skills and experience, and thus the Court is unable to find damages for loss of employment.

38. Plaintiff was subjected to public approbrium, substantial mental anguish, and emotional distress because of the release. He worried that the release would make it more difficult for him to find employment. He was afraid others would think he had been involved in financial manipulation and mismanagement—even fraud or embezzlement. He was embarrassed at being seen socially. Prior to the publication the plaintiff had been an outgoing individual, but afterwards he became much more withdrawn and much less active socially.

39. Much of plaintiff's mental anguish was due to losing his job, but a good deal of the mental anguish is traceable to the press release, which he felt seriously damaged his job search and subjected him to suspicion among both business and social acquaintances. In sum, the release, in and of itself, caused plaintiff mental anguish.

40. The Court's findings in this case are made after careful and thoughtful consideration of the demeanor and credibility of the witnesses and weighing all the testimony and evidence presented.

## APPLICABLE PRINCIPLES OF LAW

1. This Court will look to Oklahoma law to govern this case, as he believes the Kansas Supreme Court would hold on the choice of laws question. *Fouts v. Fawcett Publications*, 116 F.Supp. 535, 537 (D.Conn.1953). See *McDaniel v. Sinn*, 194 Kan. 625, 400 P.2d 1018 (1965).

2. Libel is a false or malicious unprivileged publication by writing, printing, picture of effigy, or other fixed representation, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation; or any malicious publication, as aforesaid, designed to blacken or vilify the memory of one who is dead, and tending to scandalize his surviving relatives and friends. 12 Okl. Stat.Ann. § 1441.

3. In determining whether a publication exposes one to public hatred, contempt, ridicule or obloquy, or tends to deprive him of public confidence or injure him in his occupation, the Court is to look to the effect of the entire article upon the mind of the average lay reader. *Fawcett Publications, Inc. v. Morris*, 377 P.2d 42 (Okl.1962).

4. As those portions of the Oklahoma statutes providing for presumed malice in libel actions have been held unconstitutional by the Oklahoma Supreme Court, the negligence test is the appropriate standard of liability for a publisher of defamatory falsehood injurious to a private individual. *Martin v. Griffin Television, Inc.*, 549 P.2d 85 (Okl.1976).

5. Plaintiff is clearly not a public official or public figure but only a private individual. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

6. The statutory provision of minimum presumed damages in libel actions has like-

wise been held unconstitutional. *Martin v. Griffin Television, Inc.*, supra.

■ 7. In order to collect punitive damages, the plaintiff must prove actual malice, that is, that the defendant published the libelous statement with knowledge that it was false or with reckless disregard as to its truth or falsity. *Gertz v. Robert Welch, Inc.*, supra; *Morgan v. Winters*, 594 P.2d 1220 (Okl.1979).

■ 8. If the statement is found to be libel per quod, rather than libel per se, the plaintiff is required to plead and prove special damages in order to recover. *Winters v. Morgan*, 576 P.2d 1152 (Okl.1978).

9. The Oklahoma courts have not recognized the slander per se exceptions to libel per quod. See *Edwards v. Crane*, 292 P.2d 1034 (Okl.1956); but see *Brown v. Skaggs-Albertson's Properties, Inc.*, 563 F.2d 983 (10th Cir. 1977).

■ 10. Special damages are limited to concrete pecuniary losses proximately caused by the libel. *M. F. Patterson Dental Supply Co. v. Wadley*, 401 F.2d 167 (10th Cir. 1968).

■ 11. Oklahoma would not allow general damages to attach once special damages are proven in a libel per quod situation. *M. F. Patterson Dental Supply Co. v. Wadley*, supra; see *Akins v. Altus Newspaper, Inc.*, 609 P.2d 1263 (Okl.1980); but see *Wegner v. Rodeo Cowboys Assoc.*, 290 F.Supp. 369, 375 (D.Colo.1968).

■ 12. In order to be libelous per se, as opposed to per quod, an article must be defamatory on its face, without the aid of extrinsic proof. *Edwards v. Crane*, 292 P.2d 1034 (Okl.1956).

■ 13. In deciding whether the alleged libel is libel per se, the Court must examine the entire press release, and the article alone must be defamatory on its face, stripped of all insinuations, innuendo, colloquim, and explanatory circumstances. *Winters v. Morgan*, supra; *Tulsa Tribune Co. v. Knight*, 174 Okl. 359, 50 P.2d 350 (1935).

14. In finding libel per se, inferences can be drawn from the language used in the publication. See *Fawcett Publications v. Morris*, supra.

■ 15. In determining if the publication is libel per se, the article must be measured by its natural and probable effect on the lay reader. *Fawcett Publications v. Morris*, supra.

■ 16. The proper test to be used in determining if an article is libel per se is whether, after considering the article in its entirety, its thought, ideal, impression, or opinion conveyed to the reader, the article engenders in the mind of the reader a conclusion, impression, or opinion of the plaintiff that is defamatory, and as such tends to expose plaintiff to public hatred, contempt and obloquy. One is to look at the logical conclusion of the reader. *Winters v. Morgan*, supra.

■ 17. One claiming libel need not be named in an article for the article to constitute libel per se. Whether an article is of a libelous character per se, and whether it has application to a particular party, are two entirely different questions, and the Court may look to extrinsic evidence to answer the latter. *Fawcett Publications v. Morris*, supra.

■ 18. When a publication is reasonably susceptible of an innocent interpretation, a finding of libel per se is precluded. *Winters v. Morgan*, supra.

■ 19. The absolute privilege for statements compelled by federal law does not extend to protect allegedly libelous inferences when the defendant is able to exercise control over the form of the statement.

■ 20. A qualified privilege exists when the communication is fairly made by a person in the discharge of some public or private duty, whether legal or moral or in the conduct of his own affairs where his interest is concerned. *Brown v. Skaggs-Albertson's Properties, Inc.*, supra.

21. When the defendant reasonably believes that circumstances exist casting upon

him the duty to make the communication, such qualified privilege exists. See *Faber v. Byrle*, 171 Kan. 38, 229 P.2d 718 (1951).

22. Once the existence of a qualified privilege is established, the burden is on the plaintiff to show abuse of the privilege. A privilege may be abused by excessive publication, use for an improper purpose, or by "actual malice," that is, ill-will, knowledge of falsity, or reckless disregard as to the truth or falsity of the defamatory matter. *Wright v. Haas*, 586 P.2d 1093 (Okl.1978); *Brown v. Skaggs-Albertson's Properties, Inc.*, supra; *Casale v. Dooner Laboratories*, 503 F.2d 303 (4th Cir. 1973).

23. Actual malice need not be shown by direct evidence, but can also be shown by inference through circumstantial evidence. *Steadman v. Lapensohn*, 408 Mich. 50, 288 N.W.2d 880 (1980); see *Herbert v. Lando*, 441 U.S. 153, 164, 99 S.Ct. 1635, 1643, 60 L.Ed.2d 115 (1979).

24. While a public figure must prove malice by clear and convincing evidence, the burden of proof of malice for a private plaintiff is by the preponderance of the evidence. *Pirre v. Printing Developments*, 468 F.Supp. 1028 (S.D.N.Y.1979).

25. If a plaintiff has shown malice, he may be entitled to punitive damages as well as general damages. *Morgan v. Winters*, 594 P.2d 1220 (Okl.1979).

## OPINION OF THE COURT INCLUDING CONCLUSIONS OF LAW

### Choice of Law

■ The first question to be decided in this case was the proper choice of law. A multi-state libel case, where the alleged libel is published in several states, raises difficult choice of law issues. Libel is a matter of state law and this Court must look to Kansas conflicts law under the rule of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Kansas courts, in tort actions, follow the rule of *lex loci delecti*, applying the law of the state where the tort or injury occurred. E.g., *McDaniel v. Sinn*, supra. No Kansas court, however, has considered where the tort or injury occurs in a multi-state libel case, i. e., nationwide dissemination. The few courts in other jurisdictions that have considered this issue have split, with some stating that the injury occurs wherever publication takes place, and others stating that the place of injury is the domicile of the injured person. See 50 Am.Jur.2d, *Libel and Slander*, § 7. This Court believes that, were the Kansas courts to consider the issue, they would hold that the domicile of the injured person is the place of injury, and that the law of the state of domicile should be applied. Another federal district court has held that Kansas would apply this choice of law rule. *Fouts v. Fawcett Publications*, supra. The advantages of this rule are concisely set forth in *Lewis v. Reader's Digest Assoc., Inc.*, 162 Mont. 401, 512 P.2d 702 (1973):

> "Generally in cases of multi-state libel, the greatest harm to a person's reputation will occur in the state of domicile. To promote the underlying purpose of libel laws some courts have seen fit to apply the law of the plaintiff's domicile. This is a better rule than that which would restrict the plaintiff to the place of printing. *Dale System, Inc. v. Time, Inc.*, [D.C.Conn.] 116 F.Supp. 527; *Fouts v. Fawcett Publications*, D.C., 116 F.Supp. [535] 538. This rule has the positive effect of restricting forum shopping by the plaintiff cited as a problem with multipublication rule. In addition, it would prevent the publishing company from choosing as a place of printing a state with favorable libel laws."

In this case, then, the Court looks to Oklahoma libel law, as plaintiff is domiciled in Oklahoma. Likewise, the events out of which the libeling material grew was in Oklahoma, although formulation of the libeling document was done elsewhere.

### Libel Per Se

As noted in the principles of law, the Court must not only decide if the alleged libel is actually libelous, he must also determine, if libel is present, if it is libel per se or libel per quod. The distinction between libel per se and libel per quod is important

because if the statement is libel per quod and not libel per se, the plaintiff is required to plead and prove special damages in order to recover. E.g., *Winters v. Morgan*, supra.

A case of "slander per se" exceptions to the libel per se special damages rule has been recognized. If the alleged libel is within one of the four special categories making up slander per se (imputation of crime, loathsome disease, effect on one's trade or business, imputation of unchastity), the plaintiff is not required to show special damages. Prosser on Torts, 4th Ed. (1971), *Libel and Slander*, § 112 at 763; *Broking v. Phoenix Newspapers*, 76 Ariz. 334, 264 P.2d 413 (1953); *Smith v. Phoenix Furniture Co.*, 339 F.Supp. 969 (D.S.C.1972). In this case, the alleged libel would appear to fall into the exception where the libelous imputation affects another's trade, profession or office. See *Wegner v. Rodeo Cowboys Assoc.*, supra. It has been stated, however, that although the Prosser theory by which the four slander per se exceptions would apply to libel is an appealing theory, it "clearly is not now the law." 1 Hanson, *Libel and Related Torts* 42. While it does not appear that Oklahoma has recognized any exception to the general rule requiring proof of special damages for libel per quod, the Tenth Circuit Court of Appeals noted, as dicta:

"[the] defamation in suit imputed the commission of a crime; so even if it were to be regarded as libel per quod, *the exception applicable in a slander case*, and cases imputing the commission of an offense would apply and would support the plaintiffs' claims for general damages." (Emphasis added.)

*Brown v. Skaggs-Albertson's Properties, Inc.*, supra.

The Tenth Circuit, while applying Oklahoma law in the case, cited no law from Oklahoma or elsewhere on the above point. While the Oklahoma courts do not appear to have explicitly confronted this issue, they have required proof of special damages where it appears the alleged libel may have affected plaintiff's trade or business. *Edwards v. Crane*, supra. This Court believes that were Oklahoma courts to specifically consider the question, they probably would not allow a slander per se exception in the instant case.

As noted above, if the statement is not per se libelous, special damages must be proven. Special damages are limited to concrete pecuniary losses proximately caused by the libel. *M. F. Patterson Dental Supply Co. v. Wadley*, supra; *Fite v. Oklahoma Publishing Co.*, 146 Okl. 150, 293 P. 1073 (1930). Prosser notes that special damages includes such things as loss of customers or business, loss of a contract, loss of employment, and even loss of a financially important marriage, but special damages do not include loss of friends, mental anguish or physical distress. Prosser on Torts, 4th Ed. (1971) *Libel and Slander* § 112 at 760.

■ As the findings of fact indicate, plaintiff has been unable to prove any special damages, as he has been unable to show any concrete pecuniary losses proximately caused by the libel. In the absence of special damages, and in the absence of the slander per se exceptions, plaintiff's action must fail if the material is not found to be libelous per se. In applying the Court's principles of law on the libel per se issue to the Court's findings of fact, *the Court concludes that the press constitutes libel per se.* After considering the article in its entirety, and the impression it conveys to the average lay reader, the Court found that the article engenders in the mind of the average lay reader an opinion of the plaintiff that is defamatory. The logical conclusion to be drawn from the language of the press release is that plaintiff is implicated in or connected with accounting irregularities, and that fraud may be involved. As the Court found in the findings of fact, these implications are false.

■ Defendant has argued that since plaintiff's name does not appear in the article, there can be no libel per se, as extrinsic facts must be shown. It is not necessary, however, for the plaintiff to be named for a publication to be libel per se. *Grove v. Morgan*, 576 P.2d 1155 (Okl.1978); *Fawcett Publications v. Morris*, supra.

The *Fawcett* court quoted at 50, from *National Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763 (8th Cir.):

> "[whether] an article is of a libelous character per se, and whether it has application to a particular party plaintiff, *are entirely distinct questions* and should not be confused. The answer to the first question is to be found in the article itself. The answer to the second question is to be found in the proof supporting proper allegations in the complaint. Those proofs may consist of either the article itself, *or of extrinsic evidence.*" (Emphasis supplied by Oklahoma Court.)

In *Fawcett*, the magazine article alleged to be libelous discussed the use of amphetamines by athletes. Embedded in the article was a statement that in 1956, several physicians observed Oklahoma football players being sprayed in the nostrils with an atomizer, and a television closeup showed Oklahoma "spray jobs" to the nation. The article did not directly state that amphetamines were given to the Oklahoma players, and did not mention the name of the plaintiff, a member of the 1956 team, in the article. The Court stated, however, that:

> "[after] reading the entire article and considering its effect upon the mind of the average lay reader, we are convinced that the article is clearly defamatory on its face and does expose the entire O.U. team to public hatred and contempt and tends to deprive the team and its membership of public confidence.

> .    .    .    .    .

> "The average lay reader *who was familiar* with the team, and its members, would necessarily believe that the regular players, including the plaintiff, were using an amphetamine spray as set forth in the article." (Emphasis added.)

*Fawcett Publications v. Morris*, 377 P.2d 42, 48, 52 (Okla.1962).

The Court concludes that the fact that plaintiff is not named in the story does not defeat an assertion that the press release is libel per se. As the Court noted in its findings of fact, the language used was such that persons reading it would, in the light of surrounding circumstances, be able to understand that it refers to the plaintiff, and was so understood by at least one other person. This fulfills the test set forth in *Lewis v. Reader's Digest Assoc.*, supra.

Defendant has also argued that the so-called "innocent interpretation rule" prevents this press release from being found libelous per se. Oklahoma has frequently grouped alleged libels into three groups: (1) those that cannot bear a defamatory meaning; (2) those that are reasonably susceptible of a defamatory meaning as well as an innocent one; and (3) those that are clearly defamatory on their face. *Akins v. Altus Newspapers, Inc.*, 609 P.2d 1263 (Okl.1980); *Fawcett Publications, Inc. v. Morris*, supra; *Kee v. Armstrong, Byrd & Co.*, 75 Okl. 84, 192 P. 494 (1919). The third category constitutes libel per se. *Fawcett*, supra. Under the innocent interpretation rule, the second category can constitute, at most, libel per quod. See *Kee*, supra; *Fite v. Oklahoma Pub. Co.*, supra. Thus, the argument goes, if the press release is reasonably capable of an innocent interpretation, it cannot constitute libel per se.

The "innocent interpretation" rule does not alter the basic determination to be made: after considering the article in its entirety as to its thought, idea, impression, or opinion conveyed to the reader, does the article engender in the mind of the average lay reader a conclusion, impression, or opinion of the plaintiff that is defamatory? *Winters v. Morgan*, supra. The fact that inferences must be drawn from a publication in order to reach a conclusion that it is defamatory does not prevent a finding of libel per se. *Fawcett Publications*, supra. If the lay reader would interpret the publication to be defamatory on its face, then it is libel per se. Just because a publication might be interpreted to have an innocent meaning does not preclude a finding of libel per se. Only when the publication is *reasonably* susceptible of an innocent interpretation is a finding of libel per se precluded. *Winters v. Morgan*, supra. The determination of whether an article is reasonably susceptible of an innocent as well as

a defamatory meaning is often difficult to make. In *Winters,* the dissenters felt strongly that the publication in issue was reasonably susceptible of an innocent interpretation, while the majority felt strongly that the article was clearly defamatory on its face and thus libel per se. Thus, reasonable judges can find it difficult to agree on what is "reasonable." However, a judge should always remember, foremost, that the rule of law is the impression left on the mind of the *average lay reader.*

■ Since this Court, in his findings of fact, found that the press release, on its face, rendered in the mind of the average lay reader a conclusion, impression or opinion of the plaintiff that is defamatory, and tends to expose him to public hatred, contempt and obloquy, deprive him of public confidence and injure him in his occupation, and that the defamatory implications are false, the Court concludes, as a matter of law, that the press release constitutes libel per se. While it might be possible to interpret the press release, as directed towards the plaintiff, in an innocent way, the article, on the whole, as it applies to plaintiff, is not *reasonably* susceptible of an innocent interpretation.

*Privilege*

As a shield for libel, defendant has argued that the statements at issue in this case are protected by an absolute privilege against an action for libel on the basis that they were required by the federal securities laws. Counsel for defendant astutely notes that it is, at times, difficult for a corporation to determine what the law requires in terms of disclosure and that a corporation should not be punished for its attempts to comply with the law.

■ This Court agrees that the policy of disclosure of all material and relevant information is an important one in the regulation of securities transactions in this country. See, e. g., *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The Court concludes that when a statement is required by federal law, an absolute privilege must exist. In this regard the Court cites, by analogy, *Farmers Educational and Cooperative Union v. WDAY, Inc.,* 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407, where the Supreme Court held that because the defendant television station was compelled by Section 315 of the Federal Communications Act of 1934, to broadcast the allegedly libelous comments, it was absolutely privileged to do so, and a libel action could not be maintained against it. In *WDAY, Inc.,* however, the defendant had no control over the language used, but rather was compelled by law to broadcast a specific statement without exercising any censorship. In the instant case, defendant had control over the form of the release, even if certain of the contents were required by federal law. Also, even if actual statements in the release were compelled by law, the allegedly defamatory implication was not so compelled. The Court is unable to find that the absolute privilege for statements compelled by federal law extends to protect allegedly libelous inferences when the defendant is able to exercise control over the form of the statement so as to state factual truth required without defamatory implications. As the Court previously noted in his order in this case filed April 24, 1979, such a blanket privilege for any statement made in the context of a required filing would permit an egregious opportunity for a malevolent corporate body to defame a former employee by maliciously adding gratuitous and untrue comments to any required disclosure.

While no absolute privilege exists in this case, it appears that a conditional or qualified privilege might attach. There are two bases of qualified privilege in Oklahoma law. One is statutory and clearly inapplicable in this case. 12 Okla.Stat.Ann. § 1443. The other is derived from case law without reference to statutes. *Wright v. Haas,* supra. While definitions of qualified privilege are usually very general in nature and difficult of precise construction, *Fawcett Publications, Inc. v. Morris,* supra, the Oklahoma court has defined a privileged communication as:

"[one] made in good faith, upon any subject matter in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty, and which contains matter which without the occasion upon which it is made, would be defamatory and actionable."

*Magnolia Petroleum Co. v. Davidson*, 194 Okl. 115, 148 P.2d 468 (1944).

The Tenth Circuit, while applying Oklahoma law, stated:

"[a] privilege exists when the communication is fairly made by a person in the discharge of some public or private duty whether legal or moral or in the conduct of his own affairs where his interest is concerned."

*Brown v. Skaggs-Albertson's Properties, Inc.*, supra.

While they have not so stated specifically, the Court believes the Oklahoma courts would agree that where the defendant reasonably believes that circumstances exist casting upon him the duty to make the communication, the privilege exists. *Faber v. Byrle*, 171 Kan. 38, 229 P.2d 718 (1951).

The effect of the conditional privilege was, at one time, to rebut the presumption of malice which Oklahoma libel law provided. The plaintiff was then required to show malice to overcome the effect of the presumption. Since presumed malice is no longer valid, Oklahoma now has no conditional privilege available to a defendant in a suit by a "public figure" plaintiff. *Wright v. Haas*, supra. The conditional privilege remains important where the plaintiff is not a public figure, since the plaintiff must show malice to overcome the privilege as opposed to merely showing negligence in the absence of the privilege. *Martin v. Griffin Television, Inc.*, 549 P.2d 85 (Okl.1976).

■ The existence of a conditional privilege is a matter of law for the court to decide, unless the circumstances of the publication are in dispute, and then it is a jury question dependent upon findings of fact. *Magnolia Petroleum Co. v. Davidson*, supra;

*Brown v. Skaggs-Albertson's Properties, Inc.*, supra. As this was a court trial, the Court will base this decision upon his findings of fact as to the circumstances of the publication.

■ The defendant has the burden of establishing the existence of a privilege by showing a recognized public or private interest which would justify the making of the communication. Prosser on Torts, 4th Ed. (1971), *Libel and Slander*, § 115 at 796; 50 Am.Jur.2d *Libel and Slander*, § 451; see *Brown v. Skaggs-Albertson's Properties, Inc.*, supra.

■ Once the existence of the privilege is established, the burden is then on the plaintiff to show abuse of the privilege. A privilege may be abused by excessive publication, use for an improper purpose, or by "actual malice,"—that is, ill-will, knowledge of falsity, or reckless disregard as to the truth or falsity of the defamatory matter. *Wright v. Haas*, supra; *Brown v. Skaggs-Albertson's Properties, Inc.*, supra; *Casale v. Dooner Laboratories*, supra; Prosser on Torts, 4th Ed. (1971) at 796. The Court in *Wright v. Haas*, quoted, at 1097, from the Restatement of the Law, Second, Torts 2d, Abuse of Privilege § 600, in defining reckless disregard:

"Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement."

■ Applying the law of qualified privilege to the findings of fact in this case, the Court holds that a privileged occasion did exist for the publication by the defendant of the press release. There existed both a public duty for disclosure based upon the federal securities laws and a private duty to communicate to the business community the restatement of earnings information.

Once the decision was made to restate the earnings for the three years in question, it is clear that defendant had a duty to make public disclosure under the securities laws.

See, e. g., 15 U.S.C.A. § 78m; 17 C.F.R. 240.10b5; Securities Act of 1933, Release No. 5092/Securities Exchange Act of 1934 Release No. 8995. Whether the decision to restate the earnings was required by law is a much tougher question, involving the elusive and treacherous concept of "materiality." See, e. g., *Statement of Financial Accounting Concepts No. 2, F.A.S.B.* The Court need not resolve, however, whether, as a matter of law, defendant was required to restate earnings. All the Court needs to find is that defendant had an honest, reasonable belief that it was required to do so. This was found in the findings of fact. As a practical matter, publicly held companies must rely on the opinions of their outside auditors in reaching decisions such as these, and defendant, by so relying, had an honest and reasonable belief that it was *required* by extant circumstances, to make such a restatement, even if the corporation thought it *should not* have to. As has been noted, once the decision to restate was made, disclosure was required.

■■■ As noted in the findings of fact, the Court also finds that defendant acted with actual malice, that is, with reckless disregard for the truth or falsity of the defamatory matter, as the evidence shows that there was a high degree of awareness of probable falsity or serious doubt as to the truth of the defamatory matter among those drafting the release. The Court notes that actual malice need not be shown by direct evidence, but can also be shown by inference through circumstantial evidence. *Steadman v. Lapensohn,* 408 Mich. 50, 288 N.W.2d 880 (1980); see *Herbert v. Lando,* 441 U.S. 153, 164, 99 S.Ct. 1635, 1643, 60 L.Ed.2d 115 (1979). Since the plaintiff has shown actual malice, he may be entitled to punitive damages as well as general damages. E.g., *Brown v. Skaggs-Albertson's Properties, Inc.,* 563 F.2d 983 (10th Cir. 1977); *Morgan v. Winters,* supra.

■■■ The evidence in this case unequivocally shows that the plaintiff was not involved in the accounting errors at MSD, actually had no more opportunity to know of such errors than the conglomerate management, and that the investigation by top management, after disclosure of the errors, verified the noncomplicity of plaintiff. As one high official stated from the witness stand, when such error was disclosed, some head must roll, and the manager and chief accountant at MSD were the foremost, convenient and logical candidates. Threaded through the entire testimony of defendant's high corporate officers, is their stand-out knowledge that competent auditing procedures by either inside auditors or outside auditors should have been able to make early and professional detection of such a large discrepancy in the MSD accounts, that headquarters management had failed to carry out the mandate of the board of directors to establish an inside auditing department, and that their selected outside auditing firm, A.G. & Co., had failed detection.

From this knowledge of facts, it is an easy inference that the self-desire of top management to lessen or free themselves of culpability and the compelling pressure of A.G. & Co. were the impetus for the composition of the press release.

This Court has presided over a number of criminal conspiracy trials where the elements of conspiracy had to be proved beyond a reasonable doubt to the jury, in which the evidence of conspiracy by the acts of the parties, rather than their confessed participation, was not nearly as strong as the inferences from the total evidence here, that the high officials of the defendant corporation and its oppressive CPA firm of A.G. & Co., through its officers, conceived and executed their plan to remove unsavory onus of incompetent business or professional conduct from themselves by foisting it on the apparently most convenient scapegoat—the plaintiff. In these criminal cases convictions ensued and were upheld by the appellate processes of law.

Defendant has argued that proof of malice must be by clear and convincing evidence, not merely by the preponderance of the evidence. Proof of malice by clear and convincing evidence has long been required where the plaintiff is a public figure. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, however, the Court found the New York Times standard did not apply to plaintiffs who were private individuals, and that so long as states did not impose liability without fault, they were free to define the appropriate standards of liability. Since the plaintiff in this case is a private individual, this line of cases does not help defendant on this issue.

Since no Oklahoma cases have been cited requiring the higher standard of proof of malice in a qualified privilege situation, this Court declines to find such a higher standard, and notes that the District Court in the Southern District of New York also upheld a preponderance test in a similar situation.

"Malice must be proven under the constitution by public figure plaintiffs and under common law where the communication is qualifiedly privileged. It does not necessarily follow, however, that the burden of proof on that issue is the same in both situations. Defendant has cited no cases where a Connecticut or New York court has required a private plaintiff to meet the higher standard of proof. We conclude that the portion of the charge relating to plaintiff's burden of persuasion correctly stated Connecticut law [the charge stated plaintiff could prove malice by a preponderance of the evidence]."

*Pirre v. Printing Developments*, 468 F.Supp. 1028 (S.D.N.Y.1979).

*Damages*

■ As noted in the findings of fact, there is insufficient evidence to support a finding that the libel actually made it more difficult for plaintiff to find employment. The Court is unable to award damages for loss of employment. The Court did find that substantial mental anguish was caused plaintiff by the press release. He feared that the release would severely damage his chances to obtain employment. He feared that his business and social acquaintances, and even his family, would think he was involved in financial irregularities or fraud. His family and social life suffered as he became embarrassed and withdrawn. The Court concludes plaintiff should be awarded $35,000.00 for his mental anguish caused by the libelous press release.

■ The Court also concludes that this is the type of case in which punitive damages are justified. As noted in the findings of fact, defendant's representatives, at the October 29th meeting, acted in reckless disregard for the truth of the defamatory implications in the press release that they drafted. Beek's candid and honest testimony in particular, as well as all the evidentiary facts and circumstances the Court has noted, showed that they had a high degree of awareness of the type of implications that could be drawn from such a release. The representatives of defendant and A.G. & Co. made sure that the release did not implicate them in any wrongdoing or negligence, but acted, if not with conscious malevolence, to make plaintiff the "fall guy," with reckless disregard and callous indifference toward plaintiff and his reputation. For such conduct of the officers acting for and on behalf of the corporation, the corporation is liable for an additional sum of damages which will deter it and others from such reprehensible conduct. For this reason, and the well-known legal rationale for such awards, the Court awards plaintiff punitive damages in the amount of $65,-000.00.

IT IS THEREFORE ORDERED that plaintiff herein is awarded damages in the sum of $35,000.00; together with punitive damages in the amount of $65,000.00, or a total of $100,000.00.

## APPENDIX A

*LEAR SIEGLER, INC.*
CORPORATE OFFICES: 3171 SOUTH BUNDY DRIVE · SANTA MONICA, CALIFORNIA 90406

*FOR RELEASE:* IMMEDIATE

JACK E. CRESSMAN
Corporate Manager
Public Relations
(213) 391-7211

SANTA MONICA, Calif., Oct. 30—Robert T. Campion, chairman and president of Lear Siegler, Inc., announced that the company is restating its earnings for its last three years by a total amount (after federal income tax effect) of $1,518,000, on the recommendation of the auditing firm of Alexander Grant & Company, who examined and reported on the years in question. The restatement will not reduce previously reported earnings more than 4% in any year, the company said, and will reduce net worth at June 30, 1975 by less than 1%. Total per share earnings (primary) for the three years of $3.26 are 12 cents less than previously reported.

Recent discovery by the company of accounting irregularities, errors, and discrepancies in its Management Services Division is the reason for the restatement, the company said. This division represented approximately 3% of the company's consolidated sales during the past three years. During the last 60 days a team of internal auditors has been working to straighten out the division's accounting records and this work has now progressed to the point that it is possible to state the impact on prior years' operating results, as follows:

| Year Ended June 30th: | Net Earnings After Taxes As Reported | Restated | Earnings Per Common Share As Reported | Restated |
|---|---|---|---|---|
| 1975 | $20,088,000 | $19,324,000 | $1.30* | $1.24* |
| 1974 | 20,055,000 | 19,465,000 | 1.17 | 1.12 |
| 1973 | 17,033,000 | 16,869,000 | .91 | .90 |

* On a fully diluted basis, $1.19 and $1.15, respectively.

The accounting principles employed by the company in the foregoing restated financial information have been reviewed with Alexander Grant & Company. Restated financial statements accompanied by an auditors' report will be issued shortly.

The company said that the investigation by its internal auditors, to date, has not disclosed evidence of fraud. Investigation is hampered by the fact that the Management Services Division was engaged in Vietnamese operations which were abruptly halted in April 1975, with a corresponding reduction in personnel and the abandonment or destruction of certain records. As a consequence, it is likely that the division will never be able to develop proper support for certain expenditures in Vietnam which might otherwise have been billed to the government. The division has other claims pending or in preparation against the U.S. government for recovery of costs under government contracts in an aggregate amount exceeding $1,500,000. These costs have been written off pending final determination of the recovery under the claims.

The company said restatement of the prior years will result in a reversal of $544,000 (after taxes) written off during the first quarter of the current fiscal year, since that

amount is now included in the prior year adjustments. Thus, first quarter earnings were $3,954,000 or 24 cents a share instead of $3,410,000 (20 cents a share) announced to the press on October 17, 1975. Earnings in the same quarter a year ago, as restated, were $3,778,000 or 22 cents a share.

The company earlier announced in its proxy statement that it has employed a new auditing firm for the fiscal year ending June 30, 1976. Selection of the new auditors will be submitted to shareholders at the company's annual meeting. The company emphasized that the decision to change auditors was not in any way related to the accounting problems in the Management Services Division.

The company noted that the Management Services Division is one of over 40 operating divisions in the company, each of which maintains its own accounting staff. Thus, the company's management is confident that the accounting irregularities which have been discovered are confined to that division alone. The company said a new division president and a new division controller have recently been appointed.

10/30/75